UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

MATTHEW JAMES GUIDRY          CASE NO.  6:20-CV-01430

VERSUS          JUDGE ROBERT R. SUMMERHAYS

MARTIN CORMIER, ET AL.          MAGISTRATE JUDGE DAVID J. AYO

## RULING

Before the Court is a Motion for Summary Judgment filed by Defendants, The City of Breaux Bridge and Detective Martin Cormier [ECF No. 61]; a Motion for Partial Summary Judgment filed by Plaintiff, Matthew James Guidry [ECF No. 64]; and a Motion for Summary Judgment by Defendant, The Travelers Indemnity Company [ECF No. 70]. The only claim brought against the City—*i.e.*, that the City is vicariously liable for the state law tort of malicious prosecution—was previously dismissed.[1] Therefore, there are no live claims against the City for which summary judgment could be granted. The Motion for Summary Judgment filed by Travelers merely adopts the motion and supporting materials filed by the City and Cormier, as Travelers contends its liability "is solely derivative of the City of Breaux Bridge and Detective Martin Cormier."[2] Therefore, the Court does not independently address Travelers motion. Accordingly, the only claim addressed in this Ruling is Guidry's sole surviving claim asserted against Cormier— that Cormier, in his individual capacity, violated Guidry's rights under the Fourth Amendment of the United States Constitution. Guidry contends "partial summary judgment on the issue of liability" is warranted, arguing it cannot be disputed that probable cause did not exist for his arrest for third degree rape. Detective Cormier contends summary judgment dismissing Guidry's claim

---

[1] *See* ECF No. 25; *see also* ECF No. 12 at 20.
[2] ECF No. 70 at 1. Plaintiff does not contest Travelers' assertion. *See id.*; *see also* ECF No. 70-1.

is warranted, because there can be no dispute that probable cause did exist for Guidry's arrest. Alternatively, Cormier asserts he is entitled to qualified immunity. For the reasons that follow, the motions are DENIED.

# I.
## BACKGROUND

On August 6, 2017, around midnight, Plaintiff Matthew Guidry attended a pool party at Park Place Apartments in Lafayette, Louisiana, with two of his roommates, Patrick Guidry and Tyree Mouton. Also attending the party was Joanelle Prejean, who arrived with Germaine Biggs. Biggs was a friend of Plaintiff, Patrick Guidry, Mouton, and Ms. Prejean. Most of the party attendees drank "copious amounts of alcoholic beverages."[3] Around 4:30 a.m., police officers arrived due to noise complaints, and the party attendees began to leave. Around the same time, Prejean and Biggs began arguing, and Biggs left the party without Prejean. Prejean ultimately ended up at Guidry's house in Breaux Bridge, along with Guidry's roommates (Patrick Guidry, Mouton, and Mouton's wife and infant child), and two of the roommates' friends (Chelsea Jones and Carly Lacomb).

At around 7:05 a.m., Lafayette Police were flagged down by Prejean, who was on a sidewalk on South College Road in Lafayette. According to police reports, Prejean was in distress. She stated she had been raped at a residence in Breaux Bridge and was then returned to Lafayette and thrown out of a car.[4] The reports further note, "While speaking with Joanelle, it was hard to understand her as statements were not clear to us."[5] Prejean was taken by ambulance to the hospital, and officers continued investigating the matter. Initially, Prejean could not name the person who allegedly raped her, but later that day, after reviewing Facebook, she named Matthew

---

[3] ECF No. 1 at 5, ¶ 10; ECF No. 64-6 at 24-25.
[4] ECF No. 64-5 at 9, 14.
[5] *Id.* at 9.

Guidry as her assailant. Three days later, Lafayette Police contacted Detective Martin Cormier of the Breaux Bridge Police Department and advised him of Prejean's complaint that she had been raped within the city limits of Breaux Bridge.[6] Shortly thereafter, Cormier took over the investigation.

On October 11, 2017, Cormier applied for an arrest warrant for Guidry on the charge of third degree rape. Judge Anthony Thibodeaux, 16th Judicial District Court, Parish of St. Martin, Louisiana, signed the arrest warrant the same day. Guidry surrendered himself to Breaux Bridge Police five days later, at which time he was arrested and detained until the following day when he was released on bond. On February 4, 2019, Guidry was charged by Bill of Information by the St. Martin Parish District Attorney's Office with third degree rape. Following a two-day bench trial, Judge Thibodeaux found Guidry not guilty of the charge. This suit followed, alleging Guidry's arrest was in violation of his Fourth Amendment rights.

## II.
### APPLICABLE LAW

### A.    Legal Standard

To prevail on a motion for summary judgment, the movant must show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[7] "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the non-moving party."[8] The movant "bears the initial responsibility of demonstrating the absence of an issue of material fact with respect to those issues on which the

---

[6] ECF No. 64-4 at 8.
[7] Fed. R. Civ. P. 56(a).
[8] *Quality Infusion Care, Inc. v. Health Care Service Corp.*, 628 F.3d 725, 728 (5th Cir. 2010); *see also Roy v. City of Monroe*, 950 F.3d 245, 254 (5th Cir. 2020) ("There exists a 'genuine dispute' about a material fact . . . when the evidence would allow a reasonable jury to return a verdict for the nonmovant.").

movant bears the burden of proof at trial."[9] Typically, if the non-movant will bear the burden of proof at trial, "the movant may merely point to an absence of evidence, thus shifting to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial."[10] However, a qualified immunity defense "alters the usual summary judgment burden of proof, shifting it to the plaintiff to show that the defense is not available."[11]

The defense of qualified immunity is "is an immunity from suit rather than a mere defense to liability."[12] The doctrine operates to shield government officials "acting within their discretionary authority from liability when their conduct does not violate clearly established statutory or constitutional law of which a reasonable person would have known."[13] Stated differently, qualified immunity protects government officials from civil liability only "when their actions could reasonably have been believed to be legal."[14] The court employs a standard of "objective reasonableness" to define "the qualified immunity accorded an officer whose request for a warrant allegedly caused an unconstitutional arrest."[15] To overcome a qualified immunity defense, the movant must establish: (1) the official violated a statutory or constitutional right, and (2) the right was "clearly established" at the time of the violation.[16] Although the plaintiff bears

---

[9] *Lindsey v. Sears Roebuck and Co.*, 16 F.3d 616, 618 (5th Cir. 1994) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)).

[10] *Id.*

[11] *Roy* at 254 (quoting *Orr v. Copeland*, 844 F.3d 484, 490 (5th Cir. 2016)); *see also Rogers v. Jarrett*, 63 F.4th 971, 975 (5th Cir. 2023) ("plaintiffs bear the 'burden' to 'demonstrate the inapplicability of the [qualified immunity] defense.'") (quoting *McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002)).

[12] *Roy* at 254 (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).

[13] *Wallace v. County of Comal*, 400 F.3d 284, 289 (5th Cir. 2005) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

[14] *King v. Handorf*, 821 F.3d 650, 654 (5th Cir. 2016) (quoting *Morgan v. Swanson*, 659 F.3d 359, 370 (5th Cir. 2011)).

[15] *Malley v. Briggs*, 475 U.S. 335, 344 (1986); *see also Winfrey v. Rogers*, 901 F.3d 483, 493 (5th Cir. 2018).

[16] *Ford v. Anderson Cnty., Texas*, 102 F.4th 292, 307 (5th Cir. 2024).

the burden of negating qualified immunity, all inferences must be drawn in his favor.[17] If the plaintiff satisfies this burden, the government official will not be shielded from liability on the basis of qualified immunity.[18]

**B.      Fourth Amendment—Unreasonable Seizure Pursuant to Legal Process**

Guidry alleges Det. Cormier violated his Fourth Amendment rights by failing to disclose material and exculpatory information in order to secure a warrant for Guidry's arrest.[19] The Warrants Clause of the Fourth Amendment mandates that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation."[20] While a warrant presumptively establishes probable cause, that presumption can be attacked.[21] Since *Franks v. Delaware*, 438 U.S. 154 (1978), it has been clearly established that an arrestee's Fourth Amendment rights are violated "where a warrant affidavit (1) contains false statements or material omissions (2) made with at least 'reckless disregard for the truth' that (3) were 'necessary to the finding of probable cause.'"[22] If an arrestee makes this showing, courts must conduct a "corrected affidavit" analysis, which requires a determination of "whether the warrant affidavit would support probable cause if the misstatements and material omissions were eliminated."[23] If the arrestee "makes the tripartite *Franks* showing, then any arrest or prosecution lacked probable cause" thereby establishing a violation of the Fourth Amendment.[24]

---

[17] *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010); *Renfroe v. Parker*, 974 F.3d 594, 599 (5th Cir. 2020).
[18] *Buehler v. Dear*, 27 F.4th 969, 981 (5th Cir. 2022).
[19] ECF No. 1 at 42-43 ¶30.
[20] U.S. CONST. amend. IV, cl. 2.
[21] *Terwilliger v. Reyna*, 4 F.4th 270, 285 n.10 (5th Cir. 2021); *Hughes v. Garcia*, 100 F.4th 611, 619 (5th Cir. 2024).
[22] *Hughes* at 619 (quoting *Franks* at 155-56); *see also Winfrey*, 901 F.3d at 494.
[23] *Id.* at 620.
[24] *Id.* at 620; *see also Tervilliger*, 4 F.4th at 285.

Probable cause is not a high bar and requires only "a probability or substantial chance of criminal activity, not an actual showing of such activity."[25] It is a "practical and common-sensical standard."[26] In assessing whether probable cause supported the issuance of an arrest warrant, courts must look to the totality of the circumstances in determining whether the facts presented to the judicial officer would assure a person of reasonable caution that the suspect committed the crime for which he is being arrested.[27] Negligence alone is insufficient to defeat qualified immunity.[28] Rather, misstatements or omissions will "vitiate an affidavit" only if it is established that the misstatements or omissions were the product "of deliberate falsehood or of reckless disregard for the truth."[29] "If the facts omitted from an affidavit are 'clearly critical' to a finding of probable cause, then recklessness may be inferred from the proof of the omission itself."[30]

### III.
### ANALYSIS

Guidry contends summary judgment is warranted against Det. Cormier "on the issue of liability for violating Mr. Guidry's Fourth Amendment rights" in connection with his arrest.[31] According to Guidry, probable cause for his arrest did not exist because: (1) it was objectively unreasonable for Det. Cormier to rely upon Ms. Prejean's version of events to support his application for an arrest warrant, and (2) Det. Cormier omitted material, exculpatory evidence from his affidavit in support of the arrest warrant. Detective Cormier seeks dismissal of Guidry's claim on the merits, or alternatively, on immunity grounds, arguing: (1) the facts Guidry contends should

---

[25] *Winfrey*, 901 F.3d at 495 (quoting *Illinois v. Gates*, 462 U.S. 213, 243 n.13 (1983)); *see also Terwilliger*, 4 F.4th at 282.
[26] *Winfrey* at 495 (quoting *Florida v. Harris*, 568 U.S. 237, 244 (2013)).
[27] *Id.* (citing *Harris*, 568 U.S. at 243).
[28] *Id.*.
[29] *Id.* (quoting *United States v. Martin*, 615 F.2d 318, 329 (5th Cir. 1980)).
[30] *Hale v. Fish*, 899 F.2d 390, 400 (5th Cir. 1990) (quoting *Martin*, 615 F.2d at 329).
[31] ECF No. 64 at 2.

have been included in the warrant affidavit are either untrue, immaterial, or were not "knowingly and maliciously omitted,"[32] and (2) because Prejean named Guidry as the perpetrator of her alleged sexual assault, probable cause existed for Guidry's arrest.[33]

Resolution of the pending motions requires an examination of whether probable cause existed for Plaintiff's arrest. Under Louisiana law, third degree rape is defined as follows:

> A. Third degree rape is a rape committed when the anal, oral, or vaginal sexual intercourse is deemed to be without the lawful consent of a victim because it is committed under any one or more of the following circumstances:
>
> (1) When the victim is incapable of resisting or of understanding the nature of the act by reason of a stupor or abnormal condition of mind produced by an intoxicating agent or any cause and the offender knew or should have known of the victim's incapacity.
>
> (2) When the victim, through unsoundness of mind, is temporarily or permanently incapable of understanding the nature of the act and the offender knew or should have known of the victim's incapacity.
>
> . . . .
>
> (4) When the offender acts without the consent of the victim.[34]

---

[32] ECF No. 61-4 at 3.

[33] *Id.* at 3, 9. Detective Cormier additionally argues summary judgment in his favor is warranted because Guidry has failed to show he acted with malice. *Id.* at 8. According to Cormier, Plaintiff's claim is actually a malicious prosecution claim under *Thompson v. Clark*, 596 U.S. 36 (2022), and therefore Plaintiff must prove malice. *See e.g. Armstrong v. Ashley*, 60 F.4th 262, 279 (5th Cir. 2023). *Thompson* "held that litigants may bring a Fourth Amendment malicious prosecution claim under § 1983." *Armstrong* at 278 (citing *Thompson*, 596 U.S. at 42). Fifth Circuit caselaw between 2003 and 2021 explicitly denied the existence of a "freestanding constitutional right to be free of malicious prosecution." *Castellano v. Fragozo*, 352 F.3d 939, 945 (5th Cir. 2003); *see also Guerra v. Castillo*, 82 F.4th 278, 289 (5th Cir. 2023). For purposes of qualified immunity, the Court must consider the law that was clearly established at the time of Det. Cormier's alleged misconduct. *Guerra* at 289; *see also Wallace v. Taylor*, 22-20342, 2023 WL 2964418, at *6 (5th Cir. Apr. 14, 2023) ("While the Fourth Amendment right to be free from arrest absent probable cause has been clearly established for some time, there was no clearly established Fourth Amendment right to be free from malicious prosecution at the time of Wallace's arrest."). As such, the Court does not address a constitutional malicious prosecution claim, beyond noting that in that context, malice typically will be found where an officer conceals or fails to disclose exculpatory evidence. *See e.g. Sanders v. English*, 950 F.2d 1152, 1163 (5th Cir. 1992); *Gordy v. Burns*, 294 F.3d 722, 728 (5th Cir. 2002), *abrogated by Castellano v. Fragozo*, 352 F.3d 939 (5th Cir. 2003) and *reinstated by Armstrong*, 60 F.4th at 279.

[34] La. R.S. 14:43.

Thus, third degree rape requires either (1) a lack of consent, or (2) a victim who is unable to lawfully consent due to intoxication or unsoundness of mind, provided the offender knew or should have known of the victim's incapacity.

Detective Cormier's warrant affidavit reads as follows:

On August 9, 2017, the Breaux Bridge Police Department was contacted by Lafayette Police Department regarding a possibly rape that occurred within the city limits of Breaux Bridge. Information obtained indicated the victim, Joanelle Prejean be sexual assaulted while at a residence located in the city limits of Breaux Bridge. Further information obtained indicated that Joanelle was scheduled to be interviewed by Lafayette Police Detective, Larry Theriot @ approximately 10:00 a.m.

On the same date, I, Detective Sgt. Martin Cormier made contact with Detective Larry Theriot via telephone and requested to observe the interview with Joanelle Prejean so, that I would be able to adequately conduct an investigation into this allegation. Once contact was made with Det. Larry Theriot, I was allowed to observe the interview conducted by Det. Larry Theriot with Joanelle Prejean. Once the interview was concluded I was able to make contact with Prejean and schedule an appointment with her to come to the Breaux Bridge Police Department so that a second interview could be conducted. I then was able to obtain copies of handwritten statement obtained by Lafayette Police Department from Tyree Mouton, Patrick Guidry, Jermain Biggs and Carly La Combs.

On August 11, 2017 Tyree Mouton and Patrick Guidry came into the Breaux Bridge Police Department. Voluntary s statements were obtained from both subjects. In a statement obtained from Tyree Mouton information obtained indicated the night of the incident, Prejean along with other party goers were consuming alcohol. Mouton advised he even share a shot with Prejean another female subject name Chelsea Jones. Mouton advised he was informed by Mathew Guidry that while at the party Prejean made moves on him. Mouton stated he heard when Prejean kept telling everybody at the party she doesn't like white guys and that she like black guys. Mouton advised once at his residence he went in the room to tend to his child when he heard Chelsea yell " What the fuck". Mouton when he entered the room Mathew pants was up and Joanelle was on the couch. Mouton advised the Chelsea possible gave zanix or a bar. Mouton advised that Prejean was brought to his residence due to her being left at the party by Jermaine. Mouton advised he drove Prejean to his residence while Mathew drove Patrick. Mouton advised he then took Joanelle away from his residence due to her behavior such hitting the wall and disturbing his daughter. Mouton advised he asked Joanelle the location of residence. Mouton advised he was unable to get an answer from Joanelle. Mouton advised once he was unable to determine her residence location it was decided to bring her to the hospital. Mouton advised once near the Girard Park area Prejean was dropped off.

On the same date, a statement was obtained from Patrick Guidry. In his statement Patrick was only able to provide limited information due to him being highly intoxicated and passed out on the floor of his residence.

On August 14, 2017 Joanelle Prejean came into him Breaux Bridge Police Department. A second interview was conduct with Joanell Prejean. In her statement Prejean advised she attend a pool party at Park Place Apartments in the Lafayette area with a male subject who she identified as Germaine Biggs. Prejean advised while at the party she consumed several alcoholic beverages (shots of fire ball), but indicated she does not normally drink. Prejean advised she met two female subjects named Areille (unknown last name) and Ashley (unknown last name) at the party. Prejean advised she asked them who they were able to obtain success at such a young age. Prejean advised a male subject named Chris Bernard came up to her while talking to Areille and Ashley and told her they went to the same school and was involved in a relationship online. Prejean advised this was the first time she met Chris Bernard. Prejean advised while she continued to speak with the Ashley and Areille Chris told her "you tripping" and kept pushing drinks on her. Prejean advised Patrick came up and said she was "Crazy". Prejean advised she mentioned to them that she recently got out of Vermillion Hospital for attempting suicide and that she need to be around positive people. Prejean advised even the two female she was talking to was telling her to calm down. Prejean admitted she was getting upset and said "ya'll need to stop calling me Crazy" and "she just want to be normal". Prejean advised they just kept calling her "Crazy". Prejean advised by that time she was yelling. Prejean advised she believed the females she was talking to earlier contacted the police due to her being. Prejean advised the police did come to the party but did not say anyone was being belligerent. Prejean advised all the police advised they were being a little too loud. Prejean advised she and Jermaine argued because he accused her of ruining Patrick's birthday party and that he treating to punch her in the face. Prejean advised she pushed Jermaine due to the comments he was making about hitting her. Prejean advised Jermaine removed all her items from his vehicle and gave it to Matt Guidry and he left. Prejean advised Matt walked up with all her items and them to her. Prejean indicated she began to cry due to Jermaine leaving her and that the police was not far by. Prejean stated she was pushed inside a vehicle by Matt Guidry, Chelsea Jones and Tyree Mouton. Prejean advised that Tyree was the driver Matt was in the back seat with her and Chelsea was in the front passenger seat. Prejean advised while in the vehicle she remembers then talking about taking her to her residence but somehow they went to Tyree's residence. Prejean advised she did tell them the location of her residence but did not tell how to get to her residence. Prejean advised they were attempting to dodge the police and that they rode around in a plaza area. Prejean advised while in the vehicle they started switching positions in the vehicle. Prejean advised at some point Tyree asked her "Do you understand what's going on" and she respond "I just wanted to be normal". Prejean advised she began to yell out the vehicle and was pulled back inside the vehicle. Prejean advised she began to yelling "help me" "help me" "help me" out the window. Prejean advised when she arrived to the residence m Breaux Bridge she believed the residence was an apartment due to the front end

of the residence being rocky. Prejean advised she was drugged out the vehicle into the residence. Prejean advised she remember it was like a hall. Prejean remembered seen like a table, a couch, a smaller table and a TV. Prejean advised someone was on the ground and she believed it was Patrick. Prejean advised the couch was a dark color and was Nettie. Prejean advised she believed the light was on in the kitchen area. Prejean advised she was placed on the couch next to Matt. Prejean advised at the time she was spitting and vomiting from the side of her mouth. Prejean advised she was told to be quite and lie down and go to sleep. Prejean advised Tyree told her you can't be loud due to his wife and kids. Prejean advised she seen when Chelsea and Tyree went into the hallway area of the residence. Prejean advised that's when the sexual assault occurred. Prejean advised she felt when her shorts were pulled to the side and someone placing their fingers inside of her. Prejean advised when she tried to pick her head up, her head was pushed back down to the side. I then asked Prejean at anytime did she them to stop. Prejean indicated she stated "NO". Prejean identified her assailant as Matt Guidry. Prejean advised she seen his face but could not tell the color of eyes but seen the dark color around his eyes. Prejean advised at the time of the attack she was going in and out of consciousness. Prejean advised she was able to feel his hair and describe his hair as being "porcupine". Prejean advised Mathew place in his penis inside of her and every time she would make a sound it was like she was attempting to vomit. Prejean advised Mathew kept her face on the side and that she was unable to breath causing her to black out. Prejean advised she remembered Mathew kissing her. Prejean advised she was unable push him off due to her going in and out of consciousness. Prejean advised she remembers it was not long until he ejaculated inside of her. Prejean stated afterward he whispered to her it was going to be alright.

On August 15, 2017, Mathew Guidry accompanied by his attorney, Bill Goode came into the Breaux Bridge Police Department to provide a statement. Under his own admission, Guidry advised he did have sex with Prejean, but claimed it was consensual. Guidry advised Joanelle was taken to the residence due to her being left at the party in Lafayette. Guidry advised him and Tyree spoke and it was decide to bring her to their residence for her to crash on the couch and to sober up. Guidry advised that Prejean was attempting to kiss him and rubbed on him when they made it the residence. Guidry advised he said "no" and helped her into the residence. Guidry advised eventual he and Prejean were alone in the living room on the couch and that they were able to calm Prejean down from being all irate. Guidry advised him and Prejean was talking and that she was telling how rough her life was and things and then she kept making moves on him. Guidry advised eventually he and Prejean had sex. Guidry advised he was told by Prejean that Jermaine would never know of their sexual encounter.

On October 9, 2017 I was able to obtain a statement from Carly Lacombe. In her statement Lacombe advised on the night of the incident she went to Patrick Guidry residence due a phone she received from Tyree Mouton. Lacombe advised she was informed Mouton that she need to come see about Patrick. Lacombe advised upon arriving at Patrick's residence she observed the Patrick being helped out the vehicle

> by Tyree, Matthew, a heavy statue female possibly red hair and other thinner female(Joanelle Prejean). Lacombe advised the thinner female appeared too intoxicated and frustrated with being at the residence. Lacombe advised she attend to Patrick and brought into his bedroom which is the first room in the hallway. Lacombe advised while in the bedroom she could hear moaning noise come from the living room area where Matthew and the thinner female were located.[35]

As evidenced by the affidavit, whether probable cause existed for Guidry's arrest turns upon whether Prejean's version of events "would assure a person of reasonable caution" that Guidry committed the crime of third degree rape.[36] Cormier contends it was entirely reasonable for him to rely solely on Prejean's statements as his basis for probable cause, because he had no reason to believe Prejean had provided false information, and because the omitted information has no bearing on whether or not Prejean consented to sexual intercourse.[37] Under the present facts, the Court disagrees.

Generally, a victim's accusation that identifies an individual as the perpetrator of an offense is sufficient to establish probable cause.[38] However, this general rule is "subject to the qualification of objective reasonableness," and police may not rely on a victim's veracity to establish probable cause if circumstances or actual knowledge reveal that the victim has provided false information, did not accurately describe what was seen, was in some fashion mistaken regarding his or her recollection, or there is some other indication that the information is not reliable.[39] In this matter, the Court finds at the time of arrest, Cormier was aware of information that undercut his reliance on Ms. Prejean's version of events.

---

[35] ECF No. 64-4 at 23-25 (grammatical and typographical errors in original).
[36] *Winfrey* at 495.
[37] ECF No. 76 at 4.
[38] *Johnson v. Bryant*, 46 F.3d 66, *3 (5th Cir. 1995); *see also Roy*, 950 F.3d at 255-56.
[39] *Johnson*, *supra*; *see also United States v. Burbridge*, 252 F.3d 775, 778 (5th Cir. 2001); *Hale*, 899 F.2d at 399.

Prior to execution of the warrant affidavit, Cormier was aware that Ms. Prejean had recently been hospitalized at Vermilion Behavioral Health Systems ("Vermilion Hospital") for attempted suicide.[40] He was aware Prejean was prescribed Seroquel, Depakote and Lexapro (which Prejean described as a "mood stabilizer"), and that (according to Prejean) she had not taken her psychiatric medications for three days prior to the alleged rape.[41] Cormier was aware that several persons who were at the Breaux Bridge residence at the time of the alleged events advised Lafayette Police that they attempted to bring Prejean to Lafayette General Hospital on the day of the incident due to the very troubling behavior Prejean exhibited after the sexual encounter.[42] However, they ultimately left Prejean at Girard Park because as they neared the hospital, Prejean began kicking and punching occupants of the vehicle.[43] Cormier was also aware that Prejean's date and friend, Germaine Biggs, told police that he had known Prejean "for over 2 years and ha[d] never seen her like this, she's been suicidal and she really needs help."[44]

Detective Cormier's investigation notes indicate that at some point prior to September 25, 2017, someone with the District Attorney's office advised him "a good idea would be to obtain [Prejean's] medical records for Vermilion Hospital."[45] Cormier's notes reflect that Prejean's "capacity" would be an issue in the investigation.[46] On September 27, 2017, Cormier obtained Prejean's medical records from Vermilion Hospital.[47] Those records reflect that Prejean was

---

[40] *See e.g.* ECF No. 64-6 at 6.
[41] *See* ECF No. 64-5 at 9; ECF No. 64-6 at 13, 25, 48-49.
[42] ECF No. 64-6 at 93, 97; ECF No. 64-7 at 22 (Prejean "sounded possessed"), ECF No. 64-6 at 84-85 (Prejean urinated on the sofa; Prejean was kicking and screaming "someone raping me," with her legs "in the air as if someone was really raping her"; when asked for her home address, Prejean would scream "John Wayne is raping me and he broke my heart"); *see also* ECF No. 64-4 at 9; ECF No. 64-5 at 14.
[43] ECF No. 64-6 at 97.
[44] *Id.* at 83.
[45] ECF No. 64-4 at 13.
[46] *Id.* at 16; ECF No. 64-8 at 39.
[47] ECF No. 64-1 at 4, ¶ 9; ECF No. 76-1 at 2, ¶ 9.

admitted on July 20, 2017 pursuant to a Physician's Emergency Certificate "for depression and suicidal ideation with a plan to kill herself by car accident."[48] The records further indicate Prejean was suffering from obsessive thoughts and auditory and visual hallucinations.[49] Prejean was discharged on July 27, 2017 (ten days before the alleged rape), with diagnoses of schizoaffective disorder (bipolar type), attention deficit hyperactivity disorder, and generalized anxiety disorder.[50] Prejean's discharge instructions were to "follow up with Cognitive Development on 08/01/17 at 10:00 a.m. for mental health therapy and psychiatric medication management, and to continue taking Seroquel "for psychosis," and Depakote and Lexapro "for mood.""[51] Her prognosis upon discharge was "fair with compliance."[52]

While the arrest affidavit does state that Prejean advised people at the pool party that she had recently been discharged from Vermilion Hospital for attempting suicide, it makes no mention of the serious diagnoses and behaviors set forth in Prejean's medical records, nor of her alleged troubling behavior exhibited after the sexual encounter.[53] More importantly, the affidavit makes no mention of the fact that Prejean advised Cormier that she had failed to take her anti-psychotic and mood stabilizing medications for three days before the incident, and that the medical records reflect that Prejean suffers from obsessive thoughts and auditory and visual hallucinations when she is not stabilized with psychiatric medications. The Court finds these omissions are material, as

---

[48] ECF No. 64-6 at 6.
[49] *Id.* at 9.
[50] *Id.* at 7.
[51] *Id.* at 6, 7.
[52] *Id.* at 6.
[53] *See* n.42, *supra.*

they directly call into question whether the information provided by Prejean to Cormier was reliable.[54]

Other inconsistencies, although alone not dispositive, bolster the need for further corroboration of Prejean's version of events. For example, the affidavit notes that Prejean advised she had been pushed inside a vehicle by Matt Guidry, Chelsea Jones and Tyree Mouton, and that the four of them travelled to the residence in Breaux Bridge in the same vehicle; the affidavit also notes that Mouton stated he drove Prejean in one vehicle, and Plaintiff drove Patrick Guidry in a separate vehicle. However, the affidavit does not mention that all other persons interviewed confirmed Mouton's version of how the parties travelled to Mouton's residence.[55] Additionally, Prejean advised officers that once she arrived at the residence in Breaux Bridge, she fell out of the car "on my forehead . . . face first" into dirt and gravel, that she would not use her feet so Chelsea Jones and Matthew Guidry dragged her everywhere, and that she had cuts on her feet due to these events.[56] However, the photographs of Prejean taken on the day of the incident do not show any kind of marks on her face, and show only a tiny circular mark on the top of her foot that does not appear to be a drag wound or even a scrape.[57] Detective Cormier admits he saw no marks on Prejean's face when he interviewed her on August 9, 2017.[58] Further, Prejean originally advised police officers that the sofa where the alleged rape occurred was either red or green. Five days later she told Det. Cormier it was an "ugly tan, orangy brownish . . . Khaki color."[59] The affidavit merely says Prejean advised the sofa was a "dark color."

---

[54] *See Winfrey* at 494 (A warrant affiant must include facts and circumstances "that concern the reliability of the information and the credibility of the source to avoid deliberately or reckless false statements.") (internal quotation marks, alterations omitted).
[55] ECF No. 64-6 at 66, 90, 91, 92, 106.
[56] *Id.* at 20, 54.
[57] ECF No. 64-7 at 1-12.
[58] ECF No. 64-8 at 48, 53.
[59] *Compare* ECF No. 64-5 at 9 *with* ECF No. 64-6 at 26.

Other responses of Prejean would cause a reasonable officer to question her ability to accurately recall events. For example, when asked if the residence in Breaux Bridge was a house or apartment, Prejean responded, "It was a house and then later on it turned into an apartment, so I don't know."[60] At her August 9, 2017 interview, when asked whether she was familiar with Patrick Guidry, Prejean volunteered that she met him a week before when she and Biggs went to a small swim party at the same apartment complex in Lafayette. Prejean continued:

> Because um when me and Jermaine kind of snuck off and I needed money from him that day um I would go have sex at his friend's house and it was Patrick's. . . . And um I was actually babysitting that day and I brought my sister with me and I bought, I put my sister in the baby and I put them in the room and I told my sister watch him y'all watch her. Y'all watch this baby. . . . I have to do what I have to do for a sec and get the money and I got the money and I fed that kid. . . . You know and that was the only other time besides that me and Jermaine know each other because I used to have a girlfriend. . . . And he used to be like our ride everywhere we went and you know to party's and other stuff like and other things like that and I know I've heard of Patrick name only one other time because Kasha and him, my girlfriend Kasha and him had sex and I didn't know about that until later on.[61]

These responses, when coupled with the information in Prejean's medical records, would cause a person of reasonable caution to have concern with Prejean's ability to accurately describe the events of August 6, 2017.

Regardless of Prejean's ability to accurately recall the events on the evening in question, counsel for Cormier contends probable cause existed for Guidry's arrest pursuant to La. R.S. 14:43(A)(1) (where a victim is incapable of resisting or of understanding the nature of the act due to a stupor or abnormal condition of mind produced by an intoxicating agent and the offender knew or should have known of the victim's incapacity). Specifically, Cormier contends probable cause existed because the information supplied to Cormier indicated most party attendees "were drinking heavily," Guidry advised Cormier that he was "highly intoxicated," and "multiple witnesses . . .

---

[60] ECF No. 64-6 at 36.
[61] *Id.* at 32-33.

recalled Ms. Prejean acting erratically at the party."[62] According to Cormier, because "the partygoers were drinking heavily and they knew the others were doing so as well," any argument by Guidry that he was unaware that Prejean "was intoxicated after they left the party is not credible for purposes of a probable cause determination."[63]

The problem with this argument is that nothing in the record indicates that *Guidry* knew or should have known Prejean was "incapable of resisting or of understanding the nature of the act" due to intoxication. According to Prejean, her first interaction with Guidry was when he and others allegedly pushed her in a car to take her to the Breaux Bridge residence.[64] According to Guidry, shortly after he began drinking at the party, Prejean "tried to make a first move on [him]," but he stopped her out of loyalty to his friend Biggs.[65] Guidry advised Cormier that he next observed Prejean when he overheard Prejean and Biggs fighting. The strongest evidence that Guidry knew or should have known that Prejean was intoxicated was that Mouton then told Guidry that they should bring Prejean to their house to sober up, since Biggs had left her without a ride home.[66] But being advised that a person needs to sober up does not equate to having knowledge that a person is "incapable of resisting or of understanding the nature of the act by reason of a stupor or abnormal condition of mind produced by an intoxicating agent."[67] Guidry had only met Prejean that evening, and by his own admission, he was highly intoxicated.[68] Moreover, this argument does not negate the fact that the only information Cormier had that Prejean did not consent to sexual intercourse were Prejean's statements to Cormier to that effect. As previously discussed, "police may not rely

---

[62] ECF No. 61-4 at 10.
[63] *Id.*
[64] *See e.g.* ECF No. 64-6 at 52.
[65] ECF No. 64-6 at 64.
[66] ECF No. 64-6 at 66.
[67] La. R.S. 14:43(A)(1).
[68] *See e.g.* ECF No. 64-6 at 66, 75, 76.

on the veracity of a victim to establish probable cause if the circumstances or actual knowledge reveals that the victim has provided false information," or was in some fashion mistaken in his or her recollection.[69] In such cases, there must be additional corroboration before probable cause will exist.[70] Here, Cormier did not identify any information further corroborating Prejean's version of events.

In summary, the Court finds Det. Cormier's omission of any details regarding Prejean's very recent hospitalization and diagnoses, his omission of Prejean's statements that she had not taken her psychiatric medications for three days prior to the incident, and her admission that she drank at least five shots of alcohol that evening when she does not normally drink—particularly when coupled with other inconsistencies and fantastical statements—were material omissions that were necessary to the finding of probable cause.[71] In other words, the Court finds that had the omitted information been included in Cormier's affidavit, a reasonable judicial officer would have found further corroboration of Prejean's claims was necessary before probable cause was established. The Court further finds that for purposes of summary judgment, recklessness may be inferred, because the omissions were clearly critical to a finding of probable cause, as they directly bear on Prejean's credibility.

As to qualified immunity, when the facts and inferences are construed in the light most favorable to Guidry, Guidry has shown Cormier violated his right to be free from arrest without a showing of probable cause, that it was objectively unreasonable for Cormier to omit material information from his warrant affidavit, and that this right was clearly established at the time of the

---

[69] *Johnson*, 46 F.3d at *3, n. 5; *see also Burbridge*, 252 F.3d at 778; *Winfrey* at 494 (affiant must include facts concerning the reliability and credibility of the source).
[70] *Hale*, 899 F.2d at 399; *U.S. v. Phillips*, 727 F.2d 392, 399 (5th Cir. 1984).
[71] *Id.* at 24-25.

violation.[72] As such, Guidry has carried his burden of negating the defense of qualified immunity. However, partial summary judgment in Guidry's favor will be denied, because whether Cormier omitted material information "recklessly, knowingly, or intentionally" is a decision for the trier of fact.[73]

For the reasons set forth herein, the motions for summary judgment are DENIED, and Guidry's claim alleging a violation of his Fourth Amendment right to be free from arrest absent a good faith showing of probable cause may proceed to trial.

THUS DONE in Chambers on this 17th day of July, 2024.

**ROBERT R. SUMMERHAYS**
**UNITED STATES DISTRICT JUDGE**

---

[72] *See e.g. Hughes*, 100 F.4th at 619 ("[U]nder *Franks v. Delaware*, it is equally obvious that no reasonable competent officer would . . . make material omissions in a warrant application."); *Reitz v. Woods*, 85 F.4th 780, 792-93 (5th Cir. 2023) (the lack of exigent circumstances is a factor bearing upon whether an officer's omissions are objectively reasonable).

[73] *Winfrey* at 496; *see also Winfrey v. San Jacinto Cnty.*, 481 Fed.Appx. 969, 980 (5th Cir. 2012) ("It may be that these errors and omissions [in the warrant affidavit] resulted from carelessness or run-of-the-mill negligence. . . . Yet, for qualified immunity purposes, it is also possible that they occurred out of recklessness.").